Calvin **GRIGSBY, Michael Marek, James Valerio and Fiscal Funding, Inc., a California corporation, Plaintiffs,**

v.

**CMI CORPORATION, a Michigan corporation, et al., Defendants.**

No. C–82–6452–WWS.

United States District Court, N.D. California.

July 9, 1984.

Dennis F. Shanagher, Paul J. Sanner, Richard A. Adroin, Bronson, Bronson & McKinnon, San Francisco, Cal., for plaintiffs.

Rebecca A. Lenaburg, James P. Kleinberg, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., for defendants.

## MEMORANDUM OF OPINION AND ORDER

SCHWARZER, District Judge.

The remaining defendants, CMI Corporation ("CMI"), CMI Financial Services, Inc. ("CMIFS"), and Edward Cherney, have moved for summary judgment or to dismiss. The Torchmark defendants have

heretofore been dismissed for lack of personal jurisdiction.

When defendants' motion first came before the Court, it was denied without prejudice, the parties being advised that the Court would at a later time reconsider its ruling. Notice of the Court's intention was given to the parties on December 13, 1983, when the Court sent counsel a proposed memorandum of opinion and order granting summary judgment on the ground of lack of materiality. Counsel were given an opportunity to conduct further discovery under Fed.R.Civ.P. 56(f), to submit additional papers and to argue the matter at a further hearing held April 27, 1984. Thereafter, the parties were permitted to file post-hearing memoranda. The Court has considered the memoranda and arguments of counsel and now issues its final ruling in this matter.

## A. Background Facts

In 1979, CMI incorporated a subsidiary, CMIFS, to develop and finance equipment lease transactions, primarily involving computers. It hired the three plaintiffs, all with experience and contacts in the area, to operate that subsidiary.

A substantial portion of plaintiffs' compensation was to come to them through their equity holdings in CMIFS. The CMIFS Shareholders' Agreement, executed November 15, 1979, described the function of CMIFS's two classes of common stock. Class A common was to be used to distribute the net profits derived from the arranging, financing, and closing of equipment transactions. If CMI had provided the equipment or originated the transaction, these net profits were initially to be evenly divided between CMIFS and CMI; in other cases, the profits would accrue entirely to CMIFS. All CMIFS income derived from this net profit was to be distributed pro rata among the Class A shares. The Class A shares were also eligible to vote for CMIFS's directors in accordance with the shareholder's agreement. CMI or its nominees held 60% of the Class A shares; plaintiffs held 40%.

Class B common was to be used to distribute the lease "residuals," i.e. the value of the reversionary interest in the leased equipment. This value would be realized when the lease terminated and the lessor disposed of the equipment. Ten percent of the residuals was to be transferred to "the originating transaction manager or representative" as a commission. The remaining 90% was to be distributed pro rata among the Class B shares. Originally, CMI and plaintiffs each held 50% of the Class B shares, but in August 1980, the parties agreed that CMI would hold 60% to plaintiffs' 40%.

At the end of CMIFS's first year, disputes arose between plaintiffs and CMI's management. In October 1980, the CMI board decided to liquidate CMIFS, and entered into negotiations with plaintiffs. These negotiations culminated in three agreements executed in December 1980 and scheduled to close in January 1981. A stock purchase agreement provided for CMI's purchase of plaintiffs' shares in CMIFS for a lump sum for each plaintiff of 11.25% of CMIFS's net book value, and future periodic payments based on residuals from transactions made during the previous year. In addition, two buy-sell agreements transferred various CMIFS assets to companies individually owned by two of the plaintiffs.

This transaction never closed. The pre-closing audit apparently took longer than expected, and disclosed facts that led CMI to sue plaintiffs in Michigan for various breaches. CMI asked for damages and rescission of the agreements. Plaintiffs counterclaimed for, inter alia, specific performance of the agreements.

After some initial discovery, the parties entered into settlement negotiations that culminated in a settlement agreement executed in May 1982. Under this agreement, plaintiffs assigned their shares of CMIFS for consideration similar to that set out in the 1980 agreements. The previously agreed-upon periodic payments were reduced to capitalized lump sums to eliminate any continuing relationship between the

parties. The settlement agreement also defined the interests of the parties in certain enumerated transactions and contained mutual releases on all issues encompassed in the Michigan lawsuit.

During the final phases of the settlement negotiations with plaintiffs, CMI's management also negotiated the sale of CMI to Torchmark. Torchmark acquired the shares of CMI at a premium over book value under an agreement and plan of acquisition dated June 2, 1982, which was consummated in July 1982 by a merger of CMI into a Torchmark subsidiary. After learning of this transaction, plaintiffs brought this action.

### B. *The Substance of this Action*

Plaintiffs' complaint alleges a violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and of Rule 10b–5(1), (2) and (3), 17 C.F.R. § 240.10b–5, along with pendent state-law claims for securities and common-law fraud and breach of fiduciary duty.

The gravamen of plaintiffs' complaint is that while defendants were negotiating with plaintiffs for the acquisition of the latter's shares in *CMIFS*, they were also negotiating, "without the knowledge of plaintiffs," for the sale of *CMI* to Torchmark. Plaintiffs contend that the negotiation for the sale of CMI and the consideration to be paid for CMI by Torchmark were material facts and that the failure to disclose them to plaintiffs was a violation of § 10(b), and amounted to common-law fraud and a violation of defendants' fiduciary duties.

### C. *Violation of § 10(b)*

#### 1. *Purchase and Sale*

■ A duty under § 10(b) to disclose material facts arises only in connection with the purchase or sale of a security; once the purchase or sale is complete, the duty no longer exists. The question here is whether the sale of the CMIFS shares had been completed when the 1980 agreements were executed or whether it was still in progress when the 1982 settlement agreement was made.

■ Once a duty to disclose information arises in connection with a purchase or sale of securities, it continues to exist so long as the individual to whom the duty is owed would have a meaningful opportunity to take lawful action on that information. Thus a leading case holds that the duty to disclose terminates when the parties are "committed," "in the classical contractual sense," to the transaction, not necessarily when the securities are formally exchanged. *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 890–91 (2d Cir. 1972); *see also Goodman v. Poland*, 395 F.Supp. 660, 689–91 (D.Md.1975). Similarly, where the parties' arrangement leaves plaintiff with no meaningful discretion over the terms of the purchase or sale, the defendant has been held to have no further duty to disclose. *See, e.g., Toledo Trust Co. v. Nye*, 588 F.2d 202 (6th Cir.1978) (shareholders' agreement providing for close corporation's unilateral exercise of repurchase option at a price determined by a specified formula on the shareholder's death), and cases cited therein.[1] On the other hand, in *Trecker v. Scag*, 679 F.2d 703 (7th Cir.1982), plaintiff minority shareholder had been prosecuting an appraisal suit in state court while the majority shareholders were conducting secret acquisition negotiations. The court held that so long as the plaintiff had the option to drop the suit (a question of state law on which the district court had not ruled) the duty of disclosure continued. *See id.* at 709–10. *See also Falls v. Fickling*, 621 F.2d 1362 (5th Cir.1980) (plaintiff's shares were sold at sheriff's sale; since plaintiff could have bid at the sale, defendants owed duty to disclose); *Ayres v. Merrill Lynch, Pierce, Fenner & Smith*, 538 F.2d 532, 537 (3d

---

**1.** Cases such as these frequently analyze the issue under the rubric of materiality, reasoning that the plaintiff's inability to act upon the information not disclosed renders the nondisclo- sure nonmaterial. *See, e.g., United States v. Margala*, 662 F.2d 622, 626 (9th Cir.1981); *Toledo Trust Co., supra*, 588 F.2d at 206.

Cir.1976) (employer exercised option to repurchase employee's shares upon employee's retirement; because retirement was voluntary decision, employer's nondisclosure about impending public offering could be material).

■ The critical fact here is that after entering into the 1980 agreement, defendants brought suit for its rescission. Even though plaintiffs counterclaimed for specific performance of the agreement, defendants' pending prayer for rescission gave plaintiffs the option until the 1982 settlement was made to confess judgment on the rescission count, an option they could have exercised on the basis of information disclosed in 1982. Defendants' argument that § 10(b) does not apply must therefore be rejected.

## 2. *Materiality*

Defendants thus had an obligation under § 10(b) to disclose to plaintiffs any material information during the 1982 negotiations. The question here is whether the information plaintiffs complain that defendants failed to disclose was "material" within the meaning of the Securities Exchange Act. Rule 10b–5(b), which implements § 10(b), states in relevant part:

> It shall be unlawful for any person …
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading …." [2]

In *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), the Supreme Court articulated the relevant standard under Rule 10b–5 as follows:

> [In a] case, involving primarily a failure to disclose … [a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might

have considered them important in the making of [his] decision.

*Id.* at 153–54, 92 S.Ct. at 1472–73. *See also TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).

The decision plaintiffs made in this case was to enter into the 1982 settlement agreement, which included the sale by plaintiffs of all their shares in *CMIFS* to defendants. The facts that plaintiffs claim were wrongfully withheld are in substance that defendants were, contemporaneously with their negotiations with plaintiffs, negotiating the sale of all *CMI* shares at a premium over book value to Torchmark, a publicly held corporation with substantial resources.[3] Plaintiffs' position seems to rest on two arguments. The first is that knowledge of the Torchmark negotiations would have enhanced their bargaining position in their negotiations with defendants. The second is that such knowledge could have been helpful in valuing their CMIFS shares. As will appear below, the first of these arguments relies on interests unprotected by the federal securities laws, and the second is not substantiated by any facts.

*Noneconomic purposes.* Plaintiffs' first argument may be restated in terms of the options that plaintiffs assert knowledge of the Torchmark negotiations would have given them. If they had known that Torchmark was seeking to acquire CMI, plaintiffs argue, they might have held out for a higher price for their CMIFS shares, the added amount representing the nuisance value that plaintiffs' continued ownership of the subsidiary's shares might have posed to Torchmark's acquisition.

■ However, an examination of the interests that § 10(b) is designed to protect establishes that the Act does not require disclosure of information bearing on such

---

**2.** While plaintiffs also allege violations of subdivisions (a) and (c), the provisions of subdivision (b) are controlling and encompass the claims under (a) and (c).

**3.** Plaintiffs offer no evidence of statements that are "material" in the sense set out in the following discussion which became misleading as a result of the failure to disclose these or other facts. *See* Rule 10b–5(b).

purposes. The purpose of § 10(b) is to protect the integrity of the securities markets by providing all investors equal access to information pertinent to the value of the claims against and interests in corporations that securities represent. Thus § 10(b) requires disclosure of information concerning a corporation's earning power or the intrinsic value of its assets as it bears on the value of the securities purchased or sold. The Ninth Circuit has referred to this as "economic materiality," and has adopted it as the criterion. *Gaines v. Haughton*, 645 F.2d 761, 777 n. 24 (9th Cir.1981). *See also Reiss v. Pan American World Airways, Inc.*, 711 F.2d 11, 14 (2d Cir.1983) (material facts are those that "definitely affect a company's financial prospects"); *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir.1968) (§ 10(b)'s concern is with information relevant to the "value of the corporation's stock or securities"). The SEC, in executing its statutory mandate to protect "investors," 15 U.S.C. §§ 77g, 78m, has consistently applied the same criterion. *See* Comment, *Disclosure of Regulatory Violations Under the Federal Securities Laws: Establishing the Limits of Materiality*, 30 Am.U.L.Rev. 225, 230–40 (1981), and authorities cited therein. Disclosure of such economic and financial information was originally, and remains, the basis of federal securities regulation. *See* Knauss, *A Reappraisal of the Role of Disclosure*, 62 Mich.L.Rev. 607, 613–15 (1964).

■ Plaintiffs do not, and cannot, contend that with respect to their bargaining for the sale of their CMIFS shares, information about the Torchmark negotiations met the test of economic materiality. Their argument is that the information might have enabled them to exploit their position to extort a higher price for their shares. In short, plaintiffs' argument is that the information was material not to the value of the *shares*, but to the value of the *shareholders' position*. On plaintiffs' theory, any kind of information which, though unrelated to economic value or financial performance, bears on the resources, motives, incentives, or bargaining positions of parties could be found to be material.

Such a view of materiality must be rejected. It is inconsistent with the purpose of § 10(b), and with the way in which the courts have applied it. It would moreover jeopardize routine arbitrage transactions, which are themselves important instruments in promoting the optimum functioning of markets and allocation of resources. Moreover, it would open the door to abuse in an area of litigation in which the potential for abuse has been widely acknowledged. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 740, 95 S.Ct. 1917, 1927, 44 L.Ed.2d 539 (1975).

■ The Court is mindful of the fact that materiality is a mixed question of law and fact, and that where the issue concerns the inferences a reasonable shareholder may draw, summary judgment will frequently be inappropriate. *See TSC Industries, supra*, 426 U.S. at 449, 96 S.Ct. at 2132. The issue here, however, does not concern the drawing of inferences from information. The issue is whether, as a matter of law, § 10(b) liability can be imposed for the failure to disclose the particular information about which plaintiffs complain. The Court holds that it cannot.

■ *Economic purposes.* Plaintiffs also try to argue that information about the Torchmark negotiations would have been useful in valuing their CMIFS shares. However, after thorough discovery, the undisputed evidence before the Court establishes that no reasonable CMIFS shareholder could have found knowledge of the Torchmark negotiations "important in the making of [his] decision" to sell. *See Affiliated Ute, supra*, 406 U.S. at 153–54, 92 S.Ct. at 1472.

To begin with, it is undisputed that plaintiffs never held or were entitled to CMI shares, nor were their CMIFS shares convertible into CMI securities. Further, Torchmark determined CMI's acquisition price on a multiple-of-earnings basis. Thus no portion of the purchase price was specifically allocated to the value of CMIFS. Finally, CMIFS stock was not publicly traded, and was subject to comprehensive pri-

vate trading restrictions. Thus plaintiffs could not offer the shares to any third-party buyer, i.e. there was no market for them other than CMI.

The uselessness to plaintiffs of information concerning the Torchmark acquisition becomes even clearer upon examination of CMIFS's circumstances during the 1982 negotiations. It is undisputed that CMIFS had essentially lain dormant since late 1980, when the original stock purchase agreement had been signed. Plaintiffs, who had been CMIFS's key personnel, departed at that time, and went into business for themselves. No plaintiff performed any valuable service for CMI or CMIFS in late 1980, 1981, or 1982. Plaintiffs' CMIFS Class A common shares, the vehicle for distribution of financial service profits, would thus have had *no* real economic value in 1982.[4]

Further, plaintiffs collectively held a minority of the outstanding Class A shares, which were voted to elect CMIFS's board. Their shares would thus have been useless in dictating any change in CMIFS policy or personnel, whether the 60% majority of the shares was held by CMI before the acquisition, or by CMI/Torchmark afterwards. Thus any argument that CMIFS shares could be more valuable because *CMI* would soon be owned by a publicly held company with substantial resources is meritless. The acquisition could have no effect on the economic value of the Class A shares. As a matter of law, then, nondisclosure of the negotiations could not have been material with respect to the Class A shares.

The Class B common shares were the vehicle for distribution of "residuals," the value of the reversionary interest in the leased equipment. All of the transactions for which residuals had yet to be distributed had been arranged by plaintiffs themselves; thus they were plainly as well informed as to the value of those residuals as were defendants. Nor do plaintiffs cite a single fact they did not know that would have affected the value of those residuals which defendants knew but did not disclose.[5] Again as a matter of law, nondisclosure of the negotiations could not have been material to the value of the Class B shares.

## D. *State-law claims*

■ The above discussion disposes of plaintiffs' state-law claims as well. California's relevant securities fraud statute is substantially equivalent in wording and scope to Rule 10b–5, *see Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir.1982); 1 Marsh & Volk, *California Securities Laws* § 14.03[2][b] (rev. ed. 1984). Thus plaintiffs' failure to raise an issue as to economic materiality is dispositive of these claims. These claims as well as plaintiffs' common-law fraud claims are also disposed of by plaintiffs' failure to raise an issue as the materiality of defendants' alleged omissions in any sense, economic or otherwise. *See, e.g., Rosenbloom v. Adams, Scott & Conway, Inc.*, 521

---

**4.** If CMI continued to arrange lease transactions during this time, plaintiffs could not claim a portion of the service profits or residuals from transactions arranged after their departure under the terms of the Shareholders' Agreement. The Agreement obviously contemplated plaintiffs' continuing labors on behalf of CMIFS and CMI as consideration for their share in the profits earned, and those labors ceased in late 1980.

**5.** Plaintiffs may claim that the fact that Torchmark was willing to acquire *CMI* at a premium conveyed information as to Torchmark's valuation of the residuals, which were CMIFS's principal remaining assets. First and foremost, this information bears on Torchmark's motives and resources, not on the value of the assets in question. It is therefore not economically material. More fundamentally, the undisputed facts discussed above make clear that Torchmark's offer conveyed no information about the value of the Class B shares. The fact that Torchmark would pay more than book value for CMI as a whole does not support an inference as to what Torchmark would have been willing to pay for CMIFS Class B common alone. Nor have plaintiffs raised any issue as to whether Torchmark valued these shares more highly than CMI. The evidence of record, in fact, suggests the opposite. Uncontradicted declarations of Torchmark officers suggest that they highly valued CMI's experience and establishment as a going concern, not its reversionary interests in equipment under lease.

F.Supp. 372, 379 (S.D.N.Y.1981) (applying California law); *Pearson v. Norton*, 230 Cal.App.2d 1, 7–8, 40 Cal.Rptr. 634 (4th Dist.1964).

Plaintiffs also claim that defendants' actions violated their fiduciary duties as majority shareholders in CMIFS to plaintiffs as minority shareholders. It is well established that majority shareholders may not profit at the minority shareholders' expense, or deprive them of advantages the majority enjoys. *See, e.g., Jones v. H.F. Ahmanson & Co.*, 1 Cal.3d 93, 115, 81 Cal.Rptr. 592, 460 P.2d 464 (1969). But plaintiffs were not minority shareholders of CMI and they have failed to come forward with any facts indicating that any of the premium Torchmark paid for CMI's shares was attributable to the *CMIFS* shares. The CMIFS shares were only a small portion of CMI's overall assets, and there is nothing in the record to suggest that the acquisition premium was in any way related to them.

E. *Disposition*

Plaintiffs have been given every opportunity to raise a genuine issue of material fact in this case. The Court initially issued a proposed ruling to the parties, detailing its proposed disposition of the action and its reasons therefor. It then allowed the parties Rule 56(f) discovery on and an opportunity to brief the issues it had stated were material. Plaintiffs have themselves conceded that

> if [plaintiffs] have not raised questions of fact based on the documents already produced on the "materiality" issue ... the chance of raising fact issues based on discovery of additional documents would be remote. In those limited circumstances, discovery has been adequate.

Plaintiffs' Reply Memorandum Regarding Proposed Opinion and Order at 11. Despite concededly adequate discovery on the issues relevant to this motion, plaintiffs have failed to raise a genuine issue of material fact with respect to any claim for relief. Summary judgment for defendants on all claims is therefore appropriate. *Cf.*

*Zell v. Intercapital Income Securities, Inc.*, 675 F.2d 1041, 1049 (9th Cir.1982). Judgment will be entered in favor of defendants as to all claims.

IT IS SO ORDERED.