765 F.2d 1369
 Fed. Sec. L. Rep. P 92,213
Calvin GRIGSBY, Michael Marek, James Valerio and Fiscal
Funding Inc., a California corporation,
Plaintiffs-Appellants,
v.
CMI CORPORATION, a Michigan corporation; CMI Financial
Services, Inc., a Michigan corporation; Edward Cherney;
Torchmark Corporation, formerly Liberty National Insurance
Holding Company, a Delaware corporation; TMK Merger
Corporation, a Michigan corporation; and TMK Leasing
Company, a Delaware corporation, Defendants-Appellees.
 No. 84-2317.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 10, 1985.
Decided July 16, 1985.
 
 Robert M. Westberg, Thomas K. Klitgaard, San Francisco, Cal., for plaintiffs-appellants.
 James P. Kleinberg, Rebecca A. Lenaburg, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., for defendants-appellees.
 Appeal from the United States District Court for the Northern District of California.
 Before DUNIWAY, HALL and WIGGINS, Circuit Judges.
 CYNTHIA HOLCOMB HALL, Circuit Judge:
 
 
 1
 This appeal presents the question of whether negotiations for the sale of a parent corporation were material to the sale of the minority shares of a subsidiary. The former holders of the minority shares have sued the parent corporation and others for failure to disclose the existence of the negotiations. The district court granted summary judgment for defendants. We affirm.
 
 FACTS:
 
 2
 In 1979 appellants Calvin Grigsby, Michael Marek and James Valerio (collectively "plaintiffs") operated CMI Financial Services, Inc. ("Financial Services") which had been incorporated by CMI Corporation ("CMI") as a subsidiary to develop and finance equipment lease transactions primarily involving computers. Plaintiffs were also minority shareholders in Financial Services. They and CMI held two classes of shares in Financial Services: Class A (voting) shares, through which net profits were distributed; and Class B shares, through which "residuals" were distributed. Residuals are the value of the reversionary interest in the leased equipment. Residuals are realized when the lease terminates and the lessor (i.e. Financial Services) disposes of the equipment. Thus the value of the residuals is related largely if not completely to the market for used computers at the end of the leases already in effect. Plaintiffs owned 40% of the Class A (voting) stock and 45% of the Class B (residual) stock.
 
 
 3
 In late 1980 the CMI board decided to liquidate Financial Services.[1] CMI and plaintiffs executed agreements which provided that CMI would purchase plaintiffs' Financial Services shares for 11.25% of the net book value of Financial Services, and that plaintiffs would receive periodic payments for the residual values on certain specified lease transactions executed by Financial Services. This purchase agreement was never consummated because the pre-closing audit disclosed facts which led CMI to sue plaintiffs in Michigan (the "Michigan lawsuit"). In settlement of the Michigan lawsuit, CMI purchased both the Class A and Class B shares held by plaintiffs for an aggregate lump sum.
 
 
 4
 After they had sold their shares, plaintiffs learned that while CMI was negotiating with them for the acquisition of their Financial Services shares in settlement of the Michigan lawsuit, CMI was also negotiating with Torchmark Corporation ("Torchmark") for the sale of CMI and its subsidiaries. Plaintiffs contend that the existence of the negotiations for the sale of CMI to Torchmark and the amount of consideration to be paid for CMI by Torchmark were material facts which should have been disclosed to them. They have therefore brought this suit alleging violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j;[2] Rule 10b-5, 17 C.F.R. Sec. 240.10b-5;[3] and California Corporations Code Sections 25401 and 25501;[4] as well as for common law fraud and breach of fiduciary duty.[5] The district court held that, although defendants were under a duty to disclose material facts at the time of the sale in settlement of the Michigan lawsuit,[6] the fact that Torchmark was about to purchase CMI was not a material fact. Grigsby v. CMI Corp., 590 F.Supp. 826 (N.D.Cal.1984). We agree.
 
 STANDARD OF MATERIALITY:
 
 5
 The standard for determining whether facts are material for purposes of the securities laws is set forth in TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976):[7] "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important" in deciding whether to sell his shares. The standard contemplates:a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of the information made available. Id.
 
 
 6
 The materiality of preliminary merger negotiations depends on the facts of the case. SEC v. Geon Industries, Inc., 531 F.2d 39, 47 (2d Cir.1976). A "looser or more subjective" test for materiality is proper in direct, single purchaser situations, as opposed to a more objective test applied to open-market transactions. Thomas v. Duralite Co., 524 F.2d 577, 584-85 (3d Cir.1975).
 
 STANDARD OF REVIEW:
 
 7
 The granting of summary judgment by the district court is subject to de novo review. This court must determine whether there are any genuine issues of material fact and whether, viewing the evidence and inferences in a light most favorable to the party opposing summary judgment, the moving party was entitled to prevail as a matter of law. United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam); Gaines v. Haughton, 645 F.2d 761, 769 (9th Cir.1981), cert. denied, 454 U.S. 1145, 102 S.Ct. 1006, 71 L.Ed.2d 297 (1982).
 
 DISCUSSION:
 
 8
 Plaintiffs make various arguments as to why there was a substantial likelihood that the existence and terms of Torchmark's offer were generally relevant to the "total mix" of information available to the parties in their deliberations. They claim that this information was material to determining the value of the stock and to the sale itself of the stock, i.e. to whether they would have sold the stock to CMI at all.
 
 
 9
 Information material to the value of the stock
 
 
 10
 Plaintiffs appeared to be arguing below that they had a right to information which would have enabled them to extract more money for their stock or threaten to become spoilers to the Torchmark/CMI deal. In a sense, such information might affect the "economic" or "market" value of the stock in this transaction because it would show a greater need or incentive for CMI to conclude a transaction with plaintiffs, so as to make CMI willing to pay more to plaintiffs. See Black's Law Dictionary 1391 (5th ed. 1979). However this is not the type of information which 10b-5 actions were intended to encompass. Knowledge of the Torchmark deal would have apprised plaintiffs of the nuisance value of retaining their Financial Services shares, if there were such a nuisance value, but the district court properly concluded that this information was not material for the purposes of a 10b-5 action.[8] At any rate, on appeal plaintiffs disclaim this argument.
 
 
 11
 Many cases have held that the serious possibility of the sale of a corporation is material to the value of the corporation's stock in certain situations. Rochez Bros., Inc. v. Rhoades, 491 F.2d 402, 408 (3d Cir.1974); Holmes v. Bateson, 434 F.Supp. 1365, 1380 (D.R.I.1977), aff'd in part, rev'd in part, 583 F.2d 542, 558 (1st Cir.1978); Dungan v. Colt Industries, Inc., 532 F.Supp. 832, 837 (N.D.Ill.1982); Childs v. RIC Group, Inc., 331 F.Supp. 1078, 1083 (N.D.Ga.1970), aff'd, 447 F.2d 1407 (5th Cir.1971) (per curiam).
 
 
 12
 Plaintiffs contend, without the support of authority, that these cases apply equally to the sale of a parent corporation: the value of CMI, or the existence of negotiations for its sale, is relevant to the value of Financial Services shares. However, there is no blanket rule that the acquisition of a parent makes a subsidiary more valuable, especially where the parent has substantial other assets and where the value of the subsidiary assets are subject principally to fixed lease rental present value calculations and to the future market for residual equipment. At any rate, plaintiffs have not provided facts which support such a claim here, and certainly not facts which meet the substantial likelihood test of TSC Industries, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757. Nor does it follow that a hypothetical infusion of capital into a parent corporation will enrich a subsidiary, absent a showing that the parent intended to invest further in the subsidiary.
 
 
 13
 In Dower v. Mosser Industries, Inc., 488 F.Supp. 1328, 1340-41 (E.D.Pa.1980), aff'd, 648 F.2d 183 (3d Cir.1981), the minority shareholders of a controlled corporation brought action against the controlled corporation and its controlling parent in connection with a merger which would make the parent the sole shareholder of the corporation. Among various allegations of misrepresentation and violation of fiduciary duty, plaintiffs charged that defendant corporation and its parent had failed to disclose that an offer had been made to purchase voting control of the parent's parent. The court stated:
 
 
 14
 Aside from bare speculation as to how [the corporation's] status might be affected by such a development, plaintiffs offered no evidence whatever to support their claim of materiality. We find that an offer to purchase a controlling interest of a twice-removed corporate parent is completely immaterial to minority shareholders faced with the investment decisions at issue here. The inclusion of such information might very well have served only to confuse the minority and, at best, would not have been helpful.
 
 
 15
 Id. Without a specific factual showing to the contrary, a similar conclusion is warranted here.
 
 
 16
 Plaintiffs also claim that knowledge of the acquisition would have given plaintiffs a means for valuing Financial Services shares. Although no portion of the CMI acquisition price was specifically allocated to Financial Services, plaintiffs argue that Torchmark's offer could have been allocated in a way that placed a dollar value on Financial Services separately. Plaintiffs' accountant was of the opinion that the amount of the purchase price assigned to "Investment in sales-type leases" represented Torchmark's belief as to the fair market value of the residuals; this amount could therefore have been used by plaintiffs in valuing their Class B shares.
 
 
 17
 As the district court pointed out, however, "[t]he fact that Torchmark would pay more than book value for CMI as a whole does not support an inference as to what Torchmark would have been willing to pay for [Financial Services] Class B common alone." Grigsby, 590 F.Supp. at 833 n. 5. This is especially the case here because CMI apparently had other equipment leases besides those transacted by Financial Services. Further, the valuation by Torchmark of the "investment in sales type leases" was merely a reflection of the valuation in CMI's books. CMI's books were available to plaintiffs at the time of the Financial Services sale. Thus the information used by Torchmark in valuing the residuals was equally available to plaintiffs, who could have requested an accounting to discover it. Plaintiffs' failure to do so cannot be rectified by the present action.
 
 
 18
 Finally, Torchmark's estimate of the value of assets in a subsidiary, even if such an estimate can fairly be gleaned from a process of dissecting and analyzing its unitary purchase price for the whole of CMI, which is doubtful to say the least, represents only a third party's opinion as to future market value of residuals. This is hardly the nature of a professional appraisal. The fact is that Torchmark was buying something far different, for CMI had substantial other assets.
 
 
 19
 Information relevant to the sale of the stock
 
 
 20
 Plaintiffs maintain that had they known of Torchmark's acquisition of CMI they might have sold their shares directly to Torchmark, or they might not have sold their Class B (residual) shares at all. There is no reason to conclude that there was any substantial likelihood that Torchmark would pay materially more for Financial Services' stock which is subject to almost mechanical valuation.
 
 
 21
 Plaintiffs' latter point has some basis in law. Information relevant to the question of whether the potential seller should sell out or not has been deemed material. Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972); Nelson v. Serwold, 576 F.2d 1332, 1335 (9th Cir.) (per curiam), cert. denied, 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978); Rochez Bros., 491 F.2d at 408. However, plaintiffs do not present facts which support such a finding here.
 
 
 22
 Plaintiffs give two reasons why they might have retained their shares had they known of the acquisition of CMI and its subsidiaries by Torchmark. They first contend that the value of the residuals could have been enhanced by Torchmark, a larger, richer company than CMI. Thus plaintiffs could have held on to their shares and enjoyed the greater residuals as they came in. This argument does not withstand close scrutiny.
 
 
 23
 To restate, lease residual value is the present worth value of the estimated fair market value of what computer equipment will bring in the used equipment market at the end of the lease. The parties do not agree on what forces determine the value of the residuals. Plaintiffs claim that "[s]ince residuals are based on the value of equipment to be returned in the future, the likelihood of their realization could be enhanced by an ongoing organization having the ability to appraise the equipment and market it to advantage. The financial resources of the party holding the residuals, as well as the quality of its management, bear on the ability to realize the residuals." Plaintiffs have submitted the declaration of an accountant who states that "Torchmark's presence, in terms of financial resources, management and supervision, was likely to reduce the risk that the residuals would not be realized in the normal course of business."
 
 
 24
 We find defendants' position much more persuasive, namely that "[r]esidual values in computers ... are not determined by the financial resources of the party holding them, but by market forces and product obsolescence. Torchmark has no greater control over those factors than CMI merely because it is a wealthier corporation." It is simply unreasonable to assume that CMI would be unable to realize the market values of used computers at lease-end; it does not require significant financial strength to realize these values. Certainly there is no substantial likelihood that Torchmark would have done materially better.
 
 
 25
 Second, plaintiffs contend that they were selling the Class B shares because of their troubles with CMI and their fear that CMI would manipulate the accounting books to reduce their residuals. With Torchmark in charge, they assert, the chance of this was reduced, so they could have retained their shares with some peace of mind. However, plaintiffs' reasoning appears to be based on mere speculation, for they have presented no facts which support their argument. Defendants have presented declarations to the effect that Torchmark had no control over either the day-to-day activities or the long-term policies of CMI. CMI continues to manage its own affairs. It maintains separate offices and its own separate set of books and minutes, and holds its own directors' meetings. CMI and Torchmark share no common officers, and only one of the members of Torchmark's board of directors sits on the CMI board of directors. Nothing indicates that the acquisition by Torchmark would transform the managers of CMI into "nicer guys" who would avoid manipulating the accounts in a manner unfavorable to Financial Services. Furthermore, CMI's ability to effectively manipulate the accounts in a fraudulent way (even if it had the proclivity to do so, which seems doubtful) is highly questionable. Plaintiffs have legal rights to enforce full and proper accounting, with access to discovery and the possibility of punitive damages for any gross fiduciary breach.
 
 
 26
 Plaintiffs apparently do not dispute on appeal that their state law claims must fall with their federal claims for the reasons set out in the district court opinion. Grigsby, 590 F.Supp. at 833-34.
 
 CONCLUSION:
 
 27
 Notwithstanding the expansive wording of the materiality standards cited by plaintiffs, not everything which might affect price or value is material. As pointed out above, the strong personal desire or need for the buyer to buy or the seller to sell, or the financial ability of the buyer to buy, are not material facts that must be revealed to avoid the stigma of fraud and 10b-5 violation. The fact that the new buyer might be a nicer person to deal with is likewise immaterial.
 
 
 28
 The potential for abuse of 10b-5 actions has been recognized by the Supreme Court in Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 740, 95 S.Ct. 1917, 1927, 44 L.Ed.2d 539 (1975). See also Herpich v. Wallace, 430 F.2d 792, 804-05 (5th Cir.1970). Nor were the protections of Section 10(b) and Rule 10b-5 intended to establish a scheme of investors' insurance. See List v. Fashion Park, Inc., 340 F.2d 457, 463 (2d Cir.), cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965). Although plaintiffs may feel wronged by defendants' failure to tell them everything that was going on at CMI, plaintiffs have not presented enough facts to establish a substantial likelihood that a reasonable shareholder would have deemed the existence of the Torchmark negotiations important. Plaintiffs therefore cannot sustain a 10b-5 action for fraud in the purchase of the Financial Services stock.
 
 
 29
 The district court's grant of summary judgment for defendants is therefore AFFIRMED.
 
 
 
 [1]
 It is a disputed question of fact whether Financial Services became inactive at this time, just as it is disputed whether Financial Services ever generated a profit. However, these facts are not material to the issue at hand, i.e. whether negotiations for the sale of a parent corporation are material to the sale of the minority shares of a subsidiary
 
 
 [2]
 Section 10(b) provides, in pertinent part:
 It shall be unlawful for any person, directly or indirectly, by the use of any means of instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--
 * * *
 (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in public interest or for the protection of investors.
 
 
 [3]
 Rule 10b-5 provides, in pertinent part:
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 (a) To employ any device, scheme, or artifice to defraud,
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
 
 
 [4]
 California Corporations Code section 25401 provides:
 It is unlawful for any person to offer or sell a security in this state or buy or offer to buy a security in this state by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.
 California Corporations Code section 25501 provides in pertinent part:
 Any person who violates Section 25401 shall be liable to the person who purchases a security from him or sells a security to him, who may sue either for rescission or for damages (if the plaintiff or the defendant, as the case may be, no longer owns the security), unless the defendant proves that the plaintiff knew the facts concerning the untruth or omission or that the defendant exercised reasonable care and did not know (or if he had exercised reasonable care would not have known) of the untruth or omission.
 
 
 [5]
 Plaintiffs brought suit against CMI, Financial Services, Edward Cherney (CMI's chairman), Torchmark, TMK Merger Corp. and TMK Leasing Co. The last three defendants (the "Torchmark defendants") were dismissed for lack of personal jurisdiction. Plaintiffs argue that although the district court was correct in determining that it had no personal jurisdiction over the Torchmark defendants, the court erred in dismissing the complaint "with prejudice" as to these defendants. This is true. Thomas v. Furness (Pacific) Ltd., 171 F.2d 434, 435 (9th Cir.1948), cert. denied, 337 U.S. 960, 69 S.Ct. 1522, 93 L.Ed. 1759 (1949); Orange Theatre Corp. v. Rayherstz Amusement Corp., 139 F.2d 871, 875 (3rd Cir.), cert. denied, 322 U.S. 740, 64 S.Ct. 1057, 88 L.Ed. 1573 (1944). However, because we are upholding the district court's decision, plaintiffs are collaterally estopped from reopening their action against the Torchmark defendants. For the sake of simplicity, the defendants who remain in the action at this point will be referred to collectively as "defendants."
 
 
 [6]
 Defendants urge upon appeal that we affirm the summary judgment on the alternative ground that they had no duty to disclose the Torchmark deal because the sale of Financial Services was complete before the parties negotiated settlement of the Michigan lawsuit. We decline to so hold for the reasons set out by the district court. Grigsby v. CMI Corp., 590 F.Supp. 826, 830-31 (N.D.Cal.1984)
 
 
 [7]
 TSC involved a suit under Rule 14a-9 (proxies). This court has nevertheless held that the TSC standard applies to Rule 10b-5 actions. Kramas v. Security Gas & Oil, Inc., 672 F.2d 766, 769 n. 3 (9th Cir.), cert. denied, 459 U.S. 1035, 103 S.Ct. 444, 74 L.Ed.2d 600 (1982)
 
 
 [8]
 Another of plaintiffs' arguments must fail for the same reason. Plaintiffs apparently valued their Financial Services shares at a lower price because CMI claimed to have limited financial resources. Now it turns out that CMI was not as financially limited as plaintiffs had supposed, for it was about to make a profit on the sale to Torchmark. But again we cannot deem "material" the net worth or buying power of a purchaser. Further, it is questionable whether plaintiffs acted reasonably, first in relying on CMI's statements regarding its own financial worth, then in accepting a lower price because of CMI's assertions