**John F. PIDCOCK, Plaintiff,**

v.

**SUNNYLAND AMERICA, INC., Joseph C. Harvard individually, as officer of Sunnyland America, Inc. and as co-executor of the Estate of L.B. Harvard, Sr. and L.B. Harvard, Jr. as co-executor of the Estate of L.B. Harvard, Sr., Defendants.**

**No. CV486–352.**

United States District Court,
S.D. Georgia,
Savannah Division.

Nov. 17, 1987.

J. Wiley Ellis, Ronald C. Berry, Savannah, Ga., for plaintiff.

William U. Norwood, Thomasville, Ga., and Malcolm R. MacLean, Savannah, Ga., for defendants.

## ORDER

EDENFIELD, District Judge.

This civil action, brought pursuant to § 10(b) and § 20(a) of the Securities and Exchange Act of 1934 (15 U.S.C. §§ 78j(b) and 78t(a), respectively), SEC Rule 10(b)(5), and state law on fraud, was tried before the Court on September 15 and 16, 1987. Having heard the testimony of the witnesses and having reviewed the relevant documentary evidence, the Court makes the following findings of fact and conclusions of law. To the extent any findings of fact constitute conclusions of law, they are adopted as such. To the extent any conclusions of law constitute findings of fact, they are so adopted.

## FINDINGS OF FACT

This case involves the buyout of ownership and subsequent sale of a close corporation: Sunnyland America, Inc. ("Sunnyland"). Plaintiff John F. Pidcock ("Pidcock") and L.B. Harvard, Sr. ("Dude") at one time shared equal ownership of Sunnyland; each holding 50% of the corporation's outstanding stock. Sunnyland is a holding company for the ownership and operation of various meat packing plants located in the Southeast region.

Sunnyland has been in existence, in various forms and shapes, since 1932. Pidcock's brother-in-law had originated Sunnyland and had hired Dude Harvard at an early stage in the corporation's history. Dude Harvard rose quickly to a position of second in command.

Pidcock's brother-in-law died in the early 1960's, leaving ownership of the corporation to Pidcock's sister. Ownership of Sunnyland remained in Pidcock's sister until Pidcock and Dude Harvard purchased Sunnyland in 1969.

Dude Harvard had been acting President of Sunnyland for some years prior to the purchase, and had been Sunnyland's general manager for an even longer period. Pidcock had been a director of Sunnyland since his sister had acquired ownership.

Pidcock arranged downpayment financing for the Pidcock/Harvard purchase of Sunnyland. Neither Pidcock nor Dude Harvard were forced to advance individual funds for the purchase. Once the purchase was consummated, Dude Harvard remained as president of Sunnyland, actively engaging in the daily operation of the various Sunnyland companies. Pidcock became chairman of the board; he did not participate in the day-to-day operations of the businesses, but did attend quarterly board meetings and took part in some decision making.

Dude Harvard had two sons: Joe C. Harvard and L.B. Harvard, Jr. ("Bryant"). Both Joe and Bryant began working for Sunnyland at an early age.

In 1964 Bryant Harvard secured his first position of import with Sunnyland when he became plant superintendent of Sunnyland's Alabama plant. The Alabama plant was subsequently shut down and sold. In 1972, Bryant became vice president in charge of operations for Sunnyland. In this capacity, in 1979, Bryant initiated a 7 million dollar facility improvement project of Sunnyland's Thomasville facilities.

Joe Harvard began working for Sunnyland at the age of 14. He was employed in various positions and at various Sunnyland plants. In 1970 Joe was promoted to as-

sistant to the president. In 1976, he became vice president in charge of all sales and marketing. In 1981, Joe Harvard was promoted to president of Sunnyland.

Although Dude Harvard continued to act as chief executive officer of Sunnyland, Joe and Bryant were actively managing Sunnyland operations. As president, Joe was Sunnyland's actual and apparent figurehead. The Harvard sons' growing authority with respect to Sunnyland operations was in line with the intent of both Dude Harvard and Pidcock that Joe and Bryant would one day take over the entire business. Dude Harvard died during the pendency of this lawsuit; his estate is represented by Joe and Bryant Harvard, the executors of the estate.

In 1981, Sunnyland suffered its first net yearly loss in an amount of about 1.9 million dollars. In 1982, Sunnyland suffered a loss in the amount of about 1.1 million dollars. These losses were due in part to natural market forces, in part to additional expense occasioned by the need to borrow 8.5 million dollars to refurbish the Thomasville plant, and in part by ineffective management.

The borrowing in 1981 of 8.5 million dollars to finance the reconstruction and improvement of Sunnyland facilities gave rise to the first business disagreement between Pidcock and Dude Harvard. The reconstruction loan was to be guaranteed by the Farmers Home Administration, which lender insisted that the stockholder's agreement between Pidcock and Dude Harvard be subordinated to the loan. The agreement between Pidcock and Dude Harvard included a buy/sell arrangement wherein Pidcock's estate would, over a period of fifteen years after his death, receive deferred payment for a buyout of his ownership. Pidcock objected to the subordination of his financial rights under the buy/sell agreement to the security interest of the lending institution. The result was a delay, of some months, in obtaining the reconstruction financing, during which time interest rates climbed significantly.

Although permanent financing was obtained, Dude Harvard offered, in 1980, to purchase Pidcock's ownership interest in Sunnyland by triggering, on certain financial terms, the buy/sell agreement. A counteroffer was made by Pidcock on different financial terms. Neither offer was accepted, and the parties did not further discuss buyout until 1982.

Notwithstanding the 1980 buyout offer by Dude Harvard to Pidcock, both men had been exploring the potential sale of Sunnyland as an entity since 1978. At one point prior to Dude's offer to Pidcock, Lykes Bros. Inc. had expressed an interest of some substance in purchasing Sunnyland; however, no deal resulted.

The two shareholders jointly sought a buyer for Sunnyland up until the transaction giving rise to this lawsuit. Both men were keen to sell the company, among other reasons, because of the shrinking viability of the regional meat packing trade in response to national market forces and because of the losses sustained by Sunnyland in particular.

Various concerns showed interest in the purchase of Sunnyland; the most serious prospect occurred in 1982 when Swift Independent Packing Co. ("SIPCO") displayed a substantial interest in buying Sunnyland. Joe Harvard conducted all negotiations for the sale. Joe met with Dude Harvard and Pidcock in early October of 1982, prior to a scheduled meeting with the president of SIPCO, to determine the bottom line price for sale of Sunnyland. Thereafter, Joe Harvard met with SIPCO representatives in Chicago. SIPCO, it turned out, did not wish to purchase Sunnyland and therefore made no offer.

In addition to conducting the operations and businesses of Sunnyland, Joe Harvard had become, by the time of the SIPCO negotiations, the point man with respect to the receiving of information relating to the possible sale of Sunnyland. Joe attended American Meat Institute ("AMI") and industry related functions and maintained contacts with representatives in the indus-

try. When Pidcock and Dude Harvard had been actively soliciting offers for the purchase of Sunnyland, each fully informed the other of all potential purchasers. Once Joe Harvard retained the position of command with respect both to running the company and to networking within the industry, he had the recognized obligation of apprising the shareholders of all material information regarding the possible sale of Sunnyland. Pidcock relied without reserve on Joe Harvard's manifestations with respect to prospects regarding the sale of Sunnyland; Joe Harvard was well aware of Pidcock's reliance on him for all material information regarding the possible sale of Sunnyland.

Following the fall-through of the SIPCO deal, Dude Harvard, and Joe and Bryant Harvard decided to seek sole ownership of Sunnyland. Their joint decision, prompted by Joe Harvard, was based both on the belief that consolidation of ownership interest in Sunnyland was necessary to initiate substantial changes in the structure and operation of the corporation and to satisfy a life-long Harvard ambition.

At Joe and Bryant Harvard's request, Pidcock met with them over lunch on October 22, 1982. There, Joe and Bryant extended an offer to buy out Pidcock's ownership of the company. The Harvards painted for Pidcock a gloomy forecast with respect to third party interests and prospects for the sale of Sunnyland. The Harvards offered Pidcock 2.2 million dollars for his stock; they acknowledged that the offering price was not book value but they said it was the best they could do. Pidcock agreed to consider the offer.

On October 26, 1982, Pidcock wrote Joe Harvard agreeing to accept 2.2 million dollars for his stock, contingent upon certain additional terms. Pidcock's decision to sell his ownership in Sunnyland was motivated by his then failing health and attendant desire to safeguard financially his wife's future, his faltering trust in Joe and Bryant's capacity adequately to manage Sunnyland, and his belief, based upon as-

surances by the Harvards, that sale of the company to a third party was doubtful.

A written contract for the redemption of Pidcock's stock was signed on December 21, 1982. The agreement provided for the redemption by Sunnyland of all outstanding stock owned by Pidcock. The contract included the following terms: Pidcock was to receive $2,212,690 cash at closing and a promissory note for $193,615 bearing interest at 15% per annum and payable over five (5) years, which obligation was to cease in the event of Pidcock's death. Also, Pidcock was to receive $90,000 per year for a period of five (5) years in exchange for an agreement not to compete; in the event of Pidcock's death before the expiration of the five (5) year period, the monies due pursuant to the noncompete provisions would be paid to Mrs. Pidcock (should she survive Mr. Pidcock) until a total of $250,000 was paid out.' In addition to the redemption agreement, a consulting agreement was also entered into between the parties. The terms of the consulting agreement were the following: Sunnyland was to pay Pidcock, for consulting services to be performed, a sum of $10,000 per year for five (5) years. Also, Sunnyland was to maintain an office for Pidcock's use, located in Savannah, the expenditures for which were not to exceed $20,000 per year. And, Sunnyland was to maintain for the five (5) year term of the agreement, life insurance and medical benefits in the amount of $50,000, which insurance and benefits had been, and were at that time, carried by Sunnyland on behalf of Pidcock. Under the consulting agreement, if Pidcock were to die prior to the expiration of the five (5) year term, all benefits thereunder would terminate, except the health and life benefits—which were to transfer to the benefit of Mrs. Pidcock.

In connection with the transference of Sunnyland ownership, negotiation continued between the Harvards and Pidcock during the time span between the initial luncheon meeting of October 22, 1982, and the signing of the sales contract on Decem-

ber 21, 1982. From the date of the initial offering through early November, the parties, on at least three occasions, discussed, by letter and by telephone, the terms of their proposed transaction. Essentially, Joe Harvard represented and was the spokesperson for the Harvard interest. From early November through the date of signing, the stockholders themselves spoke rarely, if at all, their negotiations having resolved to basic accord; however, the parties' attorneys and accountants maintained discussions through December 21, 1982, with regard to the drafting and refining of the written documents. Notwithstanding essential agreement as to basic terms, at all times from the initial offering through the moment of signing, it was made clear by Pidcock, and understood by Joe Harvard, that Pidcock, in selling his stock, believed he was giving up a valuable interest at a bargain price and that any knowledge held by the Harvards in connection with the possible sale of Sunnyland as a whole to a third party would have caused Pidcock seriously to reconsider his position, and the likelihood of sale to a third party would have caused Pidcock to change his mind altogether.

Between October 22, 1982 and early November, 1982, Pidcock had affirmatively questioned Joe Harvard regarding any potential interest by a third party for the purchase of Sunnyland. In response to these queries, Joe Harvard made mention of a fleeting interest shown by the son of a controller once employed by Sunnyland. The interest was characterized by Harvard to be of no substance, and in fact was of no substance. Other than this, Joe Harvard made no mention of any interested parties. A regular quarterly board meeting was held during the period between offer and signing wherein no discussions of any kind with reference to the sale of Sunnyland were made. At the signing of the repurchase agreement on December 21, 1982, Joe Harvard again made no mention of any interested purchasers for Sunnyland. Pidcock's decision to sell his stock was made in reliance on Harvard's representations and omissions indicating that no third party purchaser had shown an interest of substance in purchasing Sunnyland.

In the Fall of 1982, sometime prior to November 3, a broker by the name of Deming Whiting, who worked for the Albany Realty Company of Albany, Georgia, had come to understand that Sunnyland might be up for sale. Mr. Whiting called Joe Harvard on two occasions. When he first called, Harvard indicated he was going out of town, however, he invited Whiting to call again. On the second call, Harvard scheduled a meeting with Mr. Whiting.

Pursuant to the phone conversation, Mr. Whiting met with Joe Harvard at the Sunnyland offices in Thomasville to discuss a possible sale of Sunnyland. This meeting occurred prior to November 3, 1982. The meeting was by no means a negotiation session; rather, it merely presented an opportunity for the parties to meet and survey each other with regard to intentions and/or abilities in regard to the selling of Sunnyland. Mr. Whiting made an initial but reasonably comprehensive inquiry into the general business aspects of Sunnyland. Whiting also confirmed that Sunnyland was, indeed, available for purchase. Joe Harvard indicated he would accept $14 million dollars for Sunnyland.

Anticipating that a sale of Sunnyland would be a financially complex transaction, Whiting contacted William F. Hammond, an attorney and accountant in Albany, Georgia, to obtain financial consultation. Thereafter, Deming Whiting, William Hammond and Joe Harvard all met in Thomasville at Joe Harvard's office. This meeting also occurred prior to November 3, 1982. The three men conversed about Sunnyland with an emphasis on financial issues such as Sunnyland's assets, liabilities, and sales. Harvard expressed a clear interest in the sale of Sunnyland. William Hammond then indicated that, if he and Whiting were to represent Harvard with reference to securing a buyer for Sunnyland, some kind of written agreement should be executed. Harvard responded that he could not enter

into a written contract because there was another shareholder involved, but that he was in the process of acquiring the other shareholder's interest and could go forward once that was resolved.

Another real estate broker, Mr. John Sherman, who worked for the Richard Tift Company of Albany, Georgia, was, in November of 1982, seeking a purchaser for the Lykes Brothers Packing Company plant in Albany. Mr. Sherman had sent out a mailing to approximately eighteen presidents of various meat packing companies to solicit offers for the Lykes Bros. Albany plant, which, at that time, was no longer in operation. On December 4, 1982, Sherman received a written response from William R. Young, chairman of the board of Field Packing Company in Owensboro, Kentucky. In the letter, Mr. Young specifically stated that Field Packing Co. would be interested in "a viable operation with good brand identity and with management which is willing to stay on for a reasonable period of time." Lykes Bros. was not appropriate for the Field interest both because the Lykes Bros. Albany plant was non-operational and because Lykes Bros. was an ongoing concern and not about to surrender its brand name.

Mr. Sherman met with Deming Whiting on December 10, 1982. Whiting had informed Sherman of Harvard's interest in selling Sunnyland. Mr. Sherman found Whiting's information interesting in view of the letter he had recently received from Mr. Young expressing Field Co.'s apparent interest in a meat packing company of Sunnyland's ilk. Sherman was told by Whiting that he and William Hammond had spoken with Harvard about broker representation for the sale of Sunnyland and that Harvard had indicated a $14 million dollar net price for the corporation. Sherman called Harvard from his office on that date, December 10, 1982, and asked to list the company for sale at $16 million dollars at 10% broker's commission. Sherman did not reveal the identity of Mr. Young or Field Packing Company to Harvard. Harvard orally agreed to the financial terms of sale.

On December 16, 1982, Sherman called William Young, chief executive officer at Field Packing Company and told him that Sunnyland was up for sale. Young indicated that he was familiar with Sunnyland and that he thought the company presented a good fit for Field Company. Mr. Young also indicated that Field Packing Company recently had been bought out by Bon Grain, a French company. (Bon Grain is the parent company of Soparind U.S. Inc., which actually purchased Field Company). Young asked Sherman for more detailed information regarding Sunnyland.

Later the same day, December 16, 1982, shortly after speaking with Mr. Young, John Sherman telephoned Joe Harvard. Sherman revealed Field Packing Company as having an interest in Sunnyland. Sherman noted that Field had been purchased by Bon Grain. Sherman asked Harvard for more information about Sunnyland. Harvard agreed to supply the information and said it would be forthcoming. Sherman indicated William Young's initial reaction that Field and Sunnyland seemed like a good match. Harvard agreed.

On December 21, 1982, John Sherman and his senior business associate, Richard Tift, went to the Sunnyland offices in Thomasville to meet with Dude Harvard and Joe Harvard. Richard Tift was a friend of Dude Harvard and John Pidcock. Dude Harvard spoke privately with Richard Tift in his office and requested of Tift, as a personal favor, not to mention anything to John Pidcock about the current efforts being undertaken by the Harvards with reference to the sale of Sunnyland.

On December 21, the same date as the Harvards met with Richard Tift and John Sherman, the redemption agreement for the purchase of Pidcock's stock was executed.

Mr. Sherman and Mr. Whiting believed that Field Packing Company presented a legitimate prospect for the purchase of Sunnyland, and, pursuant to a phone conversation on December 29, 1982 the two entered into an agreement in connection

with a dividing of commissions between their companies and William Hammond should they have effected a sale of Sunnyland.

Subsequent to the signing of the repurchase contract by and between the Harvards and Pidcock, John Sherman continued in his efforts to bring about a purchase by Field Packing Company of Sunnyland. Sherman communicated exclusively with William Young at Field Packing Company. At that time William Young was chairman of the board, however, unbeknownst to John Sherman, Young was slowly being phased out of his position as chief decision maker for Field. Apparently, Joe Ryland, then president of Field, would have been Sherman's best contact for purposes of investigating and stimulating a sale of Sunnyland to Field. This is because Joe Ryland maintained direct contact with Mr. Richard Egan who was in charge of operations for Soparind, the new owner of Field Packing Company. William Young, who had been the chief spokesperson for Field Packing Company prior to its purchase by Soparind, stayed on at Field but in a steadily diminishing capacity, eventually acting only as a consultant. William Young died prior to the initiation of this lawsuit.

John Sherman spoke with William Young prior to February 10, 1983. Pursuant to a request made by William Young during that conversation, Sherman, first by phone call, then by letter dated February 10, 1983, asked Joe Harvard to bring certain specific data about Sunnyland with him to an American Meat Institute convention to be held in Boca Raton on February 19, 1983, at which time Harvard was to meet personally with Joe Ryland.

Joe Ryland and Joe Harvard were not unfamiliar with each other; the two had been friends for some three to five years prior to 1983. Joe Harvard had visited the Field Packing Company plant on occasions in the past and as recently as the summer of 1982; he and Joe Ryland exchanged financial, operational, and general business information about their companies.

Joe Harvard, Joe Ryland and Richard Egan were all in attendance at the AMI convention in Boca Raton on February 19, 1983. Joe Harvard brought with him the financial data as requested by William Young via John Sherman. Joe Ryland introduced Joe Harvard to Richard Egan. This was Harvard's first meeting with Mr. Egan. Egan, as vice-president in charge of operations for Soparind U.S. Inc., was the only individual who could speak authoritatively with reference to the potential for acquisition of Sunnyland by Field Packing Company. Harvard and Egan spoke for just a few minutes; the brief conversation between these men is not easily reconstructed. By pre-trial deposition, Joe Harvard testified that Richard Egan expressed an interest in whether Sunnyland was for sale and that he (Joe Harvard) said in response that Sunnyland was not, at that time, up for sale. At trial, Joe Harvard testified that no mention of any kind regarding the sale of Sunnyland was made when he and Egan spoke. Richard Egan testified, both by way of pre-trial deposition and in the witness stand, that he did not discuss in any fashion the possible sale of Sunnyland. The actual exchange of words by and between Joe Harvard and Richard Egan are relevant to, but not dispositive of the issues before the Court; therefore, the Court will not attempt specifically to reconstruct the dialogue that occurred except for the following: The Court credits Mr. Egan's testimony to the extent that he was not, as a representative of Soparind U.S. Inc., prepared to undertake discussions with reference to the purchase of Sunnyland, nor would such a discussion have been appropriate at the informal first meeting between he and Joe Harvard. Mr. Egan testified, and the Court believes, that Soparind's then recent purchase of Field Packing Company placed Bon Grain (the corporate parent of Soparind U.S. Inc.) in a sensitive position of corporate expansion into the American meat packing industry, and that a certain "learning curve," or acclimation period, was warranted before consideration of ad-

ditional acquisitions would be undertaken. If any mention of the "saleability" of Sunnyland was made by Joe Harvard, it was done fleetingly and would not have been considered seriously by Mr. Egan at that time.

More relevant to the instant inquiry is Joe Ryland's status and knowledge with reference to the possible sale of Sunnyland. Ryland testified at trial that Joe Harvard had never told him, nor was he otherwise aware of the fact, that Sunnyland was available for purchase. The Court does not credit this testimony. As a friend and industry associate of Joe Harvard, it is extremely doubtful that Ryland had not become aware of the Harvards' efforts to sell Sunnyland, particularly in view of the visits Joe Harvard made to Field Packing Company, and the comparisons of company operations that occurred between the men. Also, Richard Egan testified by deposition (albeit somewhat conjecturally) that Joe Ryland had mentioned the Sunnyland enterprise to him prior to the AMI convention but after Soparind's purchase of Field, and that Ryland indicated at that time that Sunnyland was for sale. That Egan, on behalf of Soparind, was not particularly interested in February of 1983 with the acquisition of Sunnyland or any regional meat packing organization does not assume Joe Ryland's lack of interest in such a transaction. The Court believes that Joe Ryland was aware of the conversations had between William Young and John Sherman, and specifically that Sherman had advised Joe Harvard to bring Sunnyland data with him to the AMI Boca Raton convention for a meeting with Ryland. Ryland would have liked to stimulate Soparind's interest in the purchase of Sunnyland. Clearly though, neither Joe Ryland nor William Young could bring about a purchase by Field of Sunnyland. Only Richard Egan could speak on behalf of Field or its new owner Soparind U.S. Inc., and Egan was not ready to contemplate or consider the purchase by Soparind of Sunnyland at that time. However, Bon Grain, the corporate parent of Soparind, was a financially strong organization which demonstrated, by its acquisition of Field Packing Company, its readiness to expand into the American regional meat packing industry; thus, the possibility that Soparind might, subsequent to its purchase of Field, consider the acquisition of Sunnyland (a company very similar to Field and one which, according to the testimony of all concerned, presented a "good fit" with Field) was a very real one, at least in the minds of Joe Harvard, Joe Ryland and William Young.

It being apparent that the potential for the purchase of Sunnyland by Soparind was not yet ripe for substantive consideration, the idea for such a transaction, although not extinguished, was placed at bay by Joe Harvard. From February through April 1, 1983, John Sherman tried both to establish a line of communication between Sunnyland and Field and to stimulate a sale. His efforts were unavailing because Soparind was not prepared at that time to consider the purchase of Sunnyland, and because Harvard was aware of this fact. Also, Sherman's efforts were unproductive because he was communicating with William Young, who could not speak for Soparind. Joe Harvard told John Sherman, by letter dated April 5, 1983, that his efforts were no longer needed.

On March 30, 1983, Sunnyland and John Pidcock closed on the redemption of Pidcock's stock.

After Pidcock's shares were redeemed, the Harvards undertook a program of operational changes and improvements on Sunnyland facilities, at a cost of over 1 million dollars.

In 1984, SIPCO renewed its interest in the purchase of Sunnyland; negotiations ensued and a letter of intent, at a purchase price of $7,500,000, was executed in August 1984. However, SIPCO decided not to purchase Sunnyland and subsequently withdrew from the deal.

In early winter of 1984, Soparind also expressed an interest in purchasing Sunnyland. Pursuant to a meeting arranged pri-

marily by Joe Ryland, Egan, Ryland and a senior representative of Bon Grain visited the Sunnyland offices in January 1984 to make a preliminary review of the company. However, Soparind declined to pursue a purchase of Sunnyland. Thereafter, SIPCO showed itself as a potential purchaser. When it became apparent that the SIPCO deal would not come to pass, Harvard called Egan and informed him of Sunnyland's renewed availability. This occurred sometime in late summer or early fall of 1984. Soparind immediately displayed a strong interest and negotiations began between the parties shortly thereafter. In January 1985 an agreement was signed for the purchase of Sunnyland by Soparind. In April 1985 the sale closed. The terms of the sale were 5 million dollars in cash at closing with a conditional amount, up to an additional 3 million dollars, based on Sunnyland earnings over the following two years. Ultimately, the Harvards received, in total, 7.3 million dollars for Sunnyland.

During the Summer of 1983, Richard Tift spoke with John Pidcock both about the representation undertaken by the Richard Tift Company (John Sherman) to procure a buyer for Sunnyland and of his (Tift's) private conversation with Dude Harvard. At that time, Pidcock asked Tift when this had occurred, and Tift responded that he did not remember.

In the Summer of 1986, Tift spoke more thoroughly with Pidcock about the conversation he had had with Dude Harvard and about his company's relationship with Sunnyland. This time Tift revealed the date of his meeting with Harvard. At trial, Pidcock recalled the conversation he had with Tift in 1986 as the time when he first learned of a brokerage representation by the Tift Company on behalf of the Harvards for the sale of Sunnyland.

Pidcock filed this action on October 1, 1986.

## CONCLUSIONS OF LAW

The Court has jurisdiction by virtue of the Securities and Exchange Act of 1934 and SEC Rule 10(b)(5).

The first matter to be resolved is whether plaintiff's lawsuit was timely filed. At the close of plaintiff's case, and by renewal at the conclusion of all evidence, defendants moved for a directed judgment on the basis that plaintiff's cause of action was time barred. The Court deferred ruling at trial. After consideration, the Court now holds that plaintiff's cause of action was not barred by the statute of limitations.

■ The applicable statute of limitations to be applied in this jurisdiction with respect to claims brought pursuant to § 10(b) of the Securities and Exchange Act of 1934 and SEC Rule 10(b)(5) is the two year limitations period found in the Georgia blue sky statute, O.C.G.A. § 10–5–14. *Friedlander v. Troutman, Sanders, Lockerman & Ashmore*, 788 F.2d 1500, 1509 (11th Cir.1986). This two year period begins to run at the moment plaintiff actually discovered, or in the exercise of reasonable diligence should have discovered the alleged securities law violation. *Diamond v. Lamotte*, 709 F.2d 1419, 1420 n. 1 (11th Cir.1983); *McNeal v. Paine, Weber, Jackson and Curtis, Inc.*, 598 F.2d 888, 893 n. 11 (5th Cir.1979).

■ It is undisputed that Pidcock's knowledge with regard to the undisclosed representation undertaken by the Richard Tift Company to effect the sale of Sunnyland to Field Packing Company gave rise to the instant lawsuit.

Defendants contend that, although John Pidcock actually discovered the Harvard/Tift Company relationship from conversing with Richard Tift in the summer of 1986, Pidcock had been given the same information by Tift in the summer of 1983, albeit without Tift having revealed, in the first instance, the date of his confidential discussion with Dude Harvard. Based on the 1983 revelation by Tift to Pidcock, defendants contend that Pidcock should have discovered, in the exercise of reasonable diligence, the alleged 10(b)(5) violation

by, at the very latest, December 31, 1983.[1]

The Court cannot agree with defendants' contention. The plaintiff testified that he first became aware of the representation undertaken by the Tift Company on behalf of the Harvards, and the private talk between Dude Harvard and Tift, in the summer of 1986. The Court believes Mr. Pidcock's subjective perception. Even by the objective standard of "discovery by reasonable diligence," which is the appropriate test for determining when the limitations period begins to run (*McNeal, supra*), discovery of alleged unlawful conduct by the Harvards still could not be imputed to the plaintiff prior to the summer of 1986. The reason for this is the following. First, by Mr. Tift's own accounting, the first disclosure to Pidcock was but a "mention." (Tift Deposition at 12). Second, by the summer of 1983, full ownership of Sunnyland was in the Harvards. Also, both Pidcock and the Harvards had been actively soliciting buyers for Sunnyland for years prior to the Pidcock redemption. Thus, a passing comment, by Tift to Pidcock, concerning a prior brokerage relationship with the Harvards, without reference to the date of that relationship, could not give rise to a reasonable inference of malfeasance—neither wrongdoing nor, particularly, harm was evident. Finally, the gravamen of this action is the knowledge, held by the Harvards and undisclosed to Pidcock during the period wherein the Harvards were negotiating for the purchase of Pidcock's stock, that a potential purchaser for Sunnyland might have existed; thus, that the Harvards had at one time employed a broker could not, of itself, allow for an assumption by Pidcock that the Harvards had knowledge of a purchasing prospect.

Once the sale of Sunnyland to Soparind occurred, and after having been advised by Richard Tift in the summer of 1986 of the time period when the Tift Company undertook brokerage representation for the sale of Sunnyland, and specifically, the date on which Tift was asked not to reveal his company's representation, Mr. Pidcock reasonably should have become aware, and in fact did become aware, of circumstances giving rise to his lawsuit. Having filed his action in October of 1986, plaintiff was well within the two year statute of limitations; thus, plaintiff's claim is not time barred.

SEC Rule 10(b)(5) provides that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

The essential elements of a cause of under Rule 10(b)(5) are:

"(1) false representation of a material fact

(2) made with scienter

(3) upon which the plaintiff justifiably relied

(4) that proximately caused the plaintiff's damages."

*Friedlander*, 788 F.2d at 1503 n. 3 (*quoting Diamond v. Lamotte*, 709 F.2d 1419, 1422 (11th Cir.1983).

---

1. Defendants assert that "the latest date at which the two year limitation would expire was December 31, 1985." This assertion necessarily implies that the plaintiff should have, in the exercise of reasonable diligence, discovered the basis for his lawsuit by December 31, 1983. Exactly how the defendants chose December 31, 1983 as the date of "reasonable discovery" is somewhat of a mystery. The issue is, of course, irrelevant in view of the Court's ruling; however, the Court will note that defendant's claim of December 31, 1983 as the latest possible date for the statute of limitations to have commenced appears to have been arbitrarily chosen.

Each of the essential elements will be examined individually and in succession.[2] However, before doing so, it seems appropriate first to identify the time frame that the Court deems substantively relevant to the issue of defendant's alleged 10(b)(5) liability.

Plaintiff has not specifically stated but has strongly implied that material misrepresentations, giving rise to 10(b)(5) liability, were made by the defendants at various times up to the actual closing on the purchase of Pidcock's stock, held on March 30, 1983. The Court believes the relevant cutoff date for purposes of considering the conduct of defendants, which might give rise to 10(b)(5) liability, is December 21, 1982, the date that plaintiff and defendants entered into a written agreement for the sale and purchase of plaintiff's stock, not March 30, 1983, the date of closing. The Court made factual findings in connection with circumstances occurring after December 21, 1982, not because a duty to disclose rested with defendants during this time, but because such circumstances provide insight into defendants' scienter prior to December 21, and because such circumstances are relevant to the question of causation.

■ The duty under 10(b)(5) to disclose material information arises, by the very terms of the law, only "in connection with the purchase or sale of any security;" thus, this duty terminates once the parties are "'committed,' 'in the contractual sense,' to the transaction, not necessarily when the securities are formally exchanged." *Grigsby v. CMI Corp.*, 590 F.Supp. 826, 830 (N.D.Cal.1984), *aff'd.*, 765 F.2d 1369 (9th Cir.1985) (*quoting Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 890–91 (2nd Cir.1972)). In the case *sub judice* the parties had agreed and become bound in the contractual sense when the redemption agreement was signed on December 21, 1982; it is conduct on or before this date that the Court will examine to determine the question of defendants' 10(b)(5) liability; any misrepresentations or omissions alleged by plaintiff to have been made by the defendants after December 21, 1982, cannot give rise to 10(b)(5) liability.

■ The first essential element under 10(b)(5) is a false representation or omission of a material fact. "The test for determining materiality is whether a reasonable man would attach importance to the fact misrepresented or omitted in determining the course of his action." *S.E.C. v. Carriba Air, Inc.*, 681 F.2d 1318 (11th Cir. 1982) (*citing TSC Industries v. Northway*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). The test of materiality is, generally speaking, an objective one; that is, it is based on the "reasonable man" standard. However, "[a] 'looser or more subjective' test for materiality is proper in direct, single purchaser situations, as opposed to a more objective test applied to open market transactions." *Grigsby v. CMI Corp.*, 765 F.2d 1369, 1373 (9th Cir.1985) (*quoting Thomas v. Duralite Co., Inc.*, 524 F.2d 577, 584 (3rd Cir.1975)).

In *Rochez Bros., Inc. v. Rhoades*, 491 F.2d 402 (3rd Cir.1974), *cert. den.*, 425 U.S. 993, 96 S.Ct. 2205, 48 L.Ed.2d 817 (1976) a case on which both plaintiff and defendant rely, the "materiality" standard was applied to a sale of stock between two 50 percent stockholders of a closely held corporation when the purchaser failed to disclose information relating to the purchaser's efforts to sell the company to third parties. There, the court stated:

Under this test [of materiality] there is little doubt that information concerning

---

2. A preliminary element, necessary to establish liability under Rule 10(b)(5), is use, by the defendant, of some means of interstate commerce in carrying out the alleged unlawful conduct. With good reason, neither plaintiff nor defendant addresses this "jurisdictional" element; the intrastate communications, conducted by telephone and by mail between Joe Harvard and John Pidcock in connection with the buyout of Pidcock's stock, satisfy the interstate commerce predicate of Rule 10(b)(5). *See Gower v. Cohn*, 643 F.2d 1146 (5th Cir. Unit B 1981); *Hilton v. Mumaw*, 522 F.2d 588 (9th Cir.1975); *Miller v. Affiliated Financial Corp.*, 600 F.Supp. 987 (D.C. Ill.1984).

negotiations by one owner of 50% of stock of a business with potential purchasers is material, for a reasonable man who owned the other 50% of the stock would surely attach importance to that information in deciding whether to sell out to his co-owner.

491 F.2d at 408.

■ Plaintiff contends that the defendants made material misrepresentations and omissions in failing to disclose the nature and extent of "negotiations" between the Harvards and both John Sherman and Soparind. Defendants contend, on the other hand, that the information held by the Harvards with respect to a potential sale of Sunnyland was so remote on December 21, 1982, as to amount to no more than "speculation;" thus, the information could not have influenced Pidcock in his decision to sell. Plaintiff and defendant have stated the two extremes of the spectrum. Neither position is entirely accurate; however, plaintiff's view is closer to the truth.

Mr. Pidcock testified that, had he been aware that Soparind both had (at the time in question) recently purchased Field Packing Company and had expressed an interest in the purchase of Sunnyland, he would not have sold his stock. The Court (in this case as in all hearings and trials) carefully scrutinized the demeanor and credibility of each witness who testified. Mr. Pidcock struck me especially as a man of great honesty and honor. Therefore, although it is not safe to say that Soparind had in fact expressed a real interest in purchasing Sunnyland on December 21, 1982, the Court is convinced that Mr. Pidcock would have postponed the December 21 execution of the redemption agreement had the brokerage relationship between the Tift Company and the Harvards, and the fact that the Field Packing Company had been identified as an interested purchaser, not been hidden from him. This determination would remain the same, even by an objective standard: The Harvards and Mr. Pidcock had been jointly seeking a buyer for Sunnyland for years; thus, it is fair to assume that

the potential for sale of the company as a whole would have caused "the reasonable shareholder" in Pidcock's position to wait before giving up his interest at a price significantly less then that which he would have received had the company been sold as a whole. The Court's perception as to materiality is bolstered by the fact that Dude Harvard felt it necessary to ask Richard Tift not to reveal the Tift Co./Harvard relationship; this implies that the Harvards themselves believed that had the information been timely presented to Pidcock, he (Pidcock) would have seriously reconsidered his position. The Court queries only whether plaintiff would have "attached importance" to the undisclosed information in determining whether to sell his stock. The Court answers this question in the affirmative, thus the defendants misrepresented a material fact in violation of Rule 10(b)(5).

■ The second essential element of Rule 10(b)(5) is scienter. Scienter refers to a mental state embracing either an intent to deceive, manipulate, or defraud, or an extreme recklessness in the making of the misrepresentation. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 1381, n. 12, 47 L.Ed.2d 668 (1976); *G.A. Thompson & Co. Partridge*, 636 F.2d 945, 961 (5th Cir.1981).

■ There can be no doubt that the defendants acted with the requisite scienter to establish liability under 10(b)(5). Joe Harvard admitted that he did not disclose to the plaintiff the circumstances of his contact and agreement with the Tift Company, and the prospect of Field as a potential purchaser. Harvard's decision in this respect was made with an intent to hide material information. Defendant's purported rational for his omission—namely, that he felt the information to be of no substance—is not easily accepted. Certainly, if Harvard felt obliged to reveal to Pidcock the purchasing inquiry made by the son of a past Sunnyland controller, an interest of obvious marginal promise, he would have felt the same duty with refer-

ence to the Field Co./Tift Co. interest, the latter having more substance than the former. Too, the fact that Dude Harvard asked Tift not to reveal the representation to Pidcock shows a thoughtful desire to deceive on the part of defendants. Scienter under 10(b)(5) existed.

■ The third essential element to establish liability under 10(b)(5) is justifiable reliance. Reliance is presumed when proof of material omissions is established. This presumption can be rebutted only if defendants can prove that the plaintiff did not rely on defendant's duty to disclose. *Shores v. Sklar*, 647 F.2d 462, 468 (5th Cir.1981) *cert. den.*, 454 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1982). In essence, the defendants must demonstrate that the plaintiff would have followed the same course of conduct even with full and honest disclosure. *Id.*

■ Notwithstanding the aforementioned presumption, the Court is satisfied that plaintiff relied on defendant's misrepresentations and omissions. In the time between initial luncheon meeting between the Harvards and Pidcock, and the signing of the redemption agreement, Pidcock affirmatively inquired, on more than one occasion, whether any prospective purchaser for Sunnyland appeared on the horizon. His desire to have all relevant information with respect to third party purchasing interests was absolute. Notably, the Harvards' meeting with Richard Tift and John Sherman occurred on the same day that the redemption agreement was signed, yet Pidcock was at no time made aware of the brokerage agreement undertaken by the Harvards or of the interest shown by Field. As noted earlier, Mr. Pidcock believed that he was selling his stock at bargain price. The Court is satisfied that plaintiff, in consummating his sale, relied on defendants' representation that no purchasing interest had been expressed by a third party.

Plaintiff's reliance must not only be actual, but demonstrably reasonable or justifiable. In this connection, "plaintiff must

not 'intentionally refuse[ ] to investigate "in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow." ' " *Shores*, 647 F.2d 470 n. 6 (*quoting Dupuy v. Dupuy*, 551 F.2d 1005, 1021 (5th Cir.1977) (citation omitted)). The Court is satisfied that plaintiff's reliance was not only actual but also justifiable. It is undisputed that the Harvards were the active managers and operational controllers of Sunnyland. Moreover, with reference to efforts undertaken to sell Sunnyland as a whole, Joe Harvard was the only individual actively networking within the industry and able to access viable prospects for the purchase of Sunnyland. Harvard was recognized, by all concerned, as the pointman and spokesperson for Sunnyland during the time that plaintiff and defendants were negotiating the buyout. Plaintiff had no access to information regarding interested purchasers for Sunnyland. His reliance was justified.

The final essential element of a 10(b)(5) cause of action is proximate causation of damages. Causation is closely related to, but distinct from, reliance. Many courts have discussed the elements of reliance and causation under the single framework of causation—then breaking the causation element into two components: "transaction causation" and "loss causation." *See Huddleston v. Herman & Maclean*, 640 F.2d 534, 549 n. 24 (5th Cir. Unit A 1981), *aff'd in part, rev'd in part on other grounds*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) (and cases cited therein). "In this context, the term 'transaction causation' is used to describe the requirement that the defendant's fraud must precipitate the investment decision. Reliance is necessarily closely related to 'transaction causation.' On the other hand, 'loss causation' refers to a direct causal link between the misstatement and the claimant's economic loss." *Id.*

As indicated, the "transaction causation" or reliance element of the instant 10(b)(5)

action has been established to the Court's satisfaction. Mr. Pidcock would not have sold his interest, *at the time he did,* if the Harvards had been open with him. However, the "loss causation" or causation element requires a further inquiry: even if the plaintiff would not otherwise have acted, was defendants' omission to state a material fact a proximate cause of plaintiff's loss? *Huddleston, supra,* at 549 (citation omitted). The former Fifth Circuit, binding on this Court, has defined the analysis as follows.

> The Plaintiff must prove not only that, had he known the truth, he would not have acted, but additionally that the untruth was in some reasonably direct, or proximate, way responsible for his loss. The causation requirement is satisfied in a Rule 10(b)(5) case only if the misrepresentation touches upon the reasons for the investment's decline in value. If the investment decision is induced by misstatements or omissions that are material and that were relied on by the claimant, but are not the proximate reason for his pecuniary loss, recovery under the Rule is not permitted.

*Huddleston, supra,* at 549.

That the defendants' omissions proximately caused the plaintiff's loss is a concept that the Court has had difficulty accepting from the outset of its consideration of the case. The Court's concern with the causation issue prompted it to request additional briefing from the parties. The arguments submitted in response to this request were thorough and persuasive. Nevertheless, having carefully considered the additional material, the Court is not swayed from its initial impression.

■ At the outset of the causation discussion, the Court must address plaintiff's dogmatic assertion, and distinction in reliance thereon, that the *Huddleston* case (cited above), unlike the case *sub judice,* involves a defrauded purchaser. As plaintiff has made abundantly clear, the issue of loss causation, particularly with reference to the *Huddleston* standard, is generally addressed in circumstances where a purchaser is denied 10(b)(5) recovery because, although defrauded into making the investment decision, the value of the security declines for reasons unrelated to the fraudulent misrepresentation. *See, e.g., Platsis v. E.F. Hutton & Co., Inc.,* 642 F.Supp. 1277 (W.D.Mich.1986) (security investor's monetary loss relating to investments in oil and gas limited partnership was direct result of external market conditions and not the result of misrepresentation or omission made by brokerage house); *In Re Catanella and E.F. Hutton and Co.,* 583 F.Supp. 1388 (E.D.Pa.1984) (defendant's failure to disclose that securities broker had, in the past, been found to have intentionally mishandled and "churned" customers' accounts was not proximate cause of injuries suffered by investors). Plaintiff argues that, in the context of a defrauded seller, when all other elements of a 10(b)(5) claim have been made out, causation is presumed or, at the very least, the causation standard should be loosely applied. The Court has found no authority to support plaintiff's assertions of law. Certainly, causation is not to be presumed; this would make, in the context of a buyout of stock in a close corporation, the purchaser an absolute insurer on bad business decisions by the seller, when the securities sold increase in value for reasons totally unrelated to any deceit, misstatement or omission. Likewise, the Court finds little authority for the belief that in the instant context, a relaxed or loose causation standard is appropriate. In any event, there is no need to engage in a lengthy jurisprudential debate regarding the application of relative standards of causation in various 10(b)(5) contexts. The concept of proximate cause is invariably a nebulous area and one ill-suited for concrete standards. In the case at bar, the Court is satisfied that, whether under the "traditional" causation standard or under a "relaxed" causation standard, the plaintiff has not met his burden of proof.

To demonstrate "loss" causation, the plaintiff asks the Court to link the materiality of, and plaintiff's reliance on, the de-

fendants' omission with the ultimate sale of Sunnyland to Soparind, and further to find that but for the omission, he would have held on to his interest until the sale was consummated. The fact that the defendant's omission was material, and that the plaintiff justifiably relied, does not negate a specific finding of no causation. *Moody v. Bache & Co., Inc.,* 570 F.2d 523, 528 (5th Cir.1978). The causal nexus between the defendants' omissions and the plaintiff's loss is far more attenuated than plaintiff matter-of-factly proposes; numerous presumptions must be made to keep the chain in motion.

Clearly, if the defendants' fraudulent conduct led the plaintiff to sell his stock at a loss there would be liability. Plaintiff produced expert testimony indicating that, at the time of the Harvard buyout, Mr. Pidcock's interest was worth between 4.4 million dollars and 5.2 million dollars. However, the purported value of plaintiff's shares at the time of his sale, and the fact that plaintiff sold his interest for less than the estimated value, cannot alone give rise to liability. Mr. Pidcock entered the redemption agreement with the belief that his interest was being sold at a bargain price. The relevant inquiry is not whether plaintiff's shares were worth more than that for which he sold, but rather whether the defendants' omissions gave rise to the purported pecuniary loss. No evidence was presented to the effect that the knowledge, held by the Harvards at the time of the buyout, *of itself* caused an increase in the value of Pidcock's stock. Put another way, it cannot be said that the broker arrangement between the Harvards and the Tift Company, and the interest shown by representatives of Field Packing Company, would have allowed the plaintiff to obtain a higher price for his shares at the time he sold.

At trial, all parties readily agreed that the value of part ownership in Sunnyland was not worth as much as full ownership in Sunnyland; that is, a third party purchaser would find far more attractive the purchase of Sunnyland as a whole rather than a 50% interest. Plainly, this is a predominant reason why Mr. Pidcock and Dude Harvard had not sold out to each other but, rather, for some time had sought a unified sale of Sunnyland; in this manner, the best value to each of them would be facilitated. Yet, plaintiff's focus on this basic business premise (that a controlling interest in a close corporation is more marketable and more valuable than a non-controlling interest) is misplaced in the causal inquiry. Again, Mr. Pidcock was well aware that full ownership of Sunnyland could, naturally, command a better price than part ownership—this is one reason why he had to accept less for his stock than what he thought was its true worth. But the value of Sunnyland as a whole remained the same to a third party whether purchased from one owner or two. It is an absurd proposition to suggest that Sunnyland became a more attractive prospect because ownership was held solely by the Harvards rather than by the Harvards and Pidcock. If, at the time of the Pidcock buyout, the Harvards had a viable purchaser in hand, then a strong basis would exist for the belief that the plaintiff took less for his interest than he could have obtained. However, as will be developed herein, a viable purchaser did not exist at the time of plaintiff's sale. The only "prospect" firmly established at trial was the broker arrangement between the Harvards and the Tift Company, and the interest shown by representatives of Field Packing Company. And, the Court is not persuaded that, had this information been provided to plaintiff, he could have obtained a higher price for his shares at the time he sold.

The true focus of the causal inquiry is the ultimate sale of Sunnyland to Soparind. The Court is asked by plaintiff to presume that, had he been made aware of the Field interest, and of the brokerage arrangement, he would have held his interest almost two years and would have, accordingly, shared in the benefits of the ultimate sale of Sunnyland. This is the proximate damage that has been identified. But, con-

trary to plaintiff's assertion that such damage is clear, the Court sees a great many gaps which necessarily must be filled before the causal relationship between the omission and this alleged injury is shown. The following hypothetical may help to put the inquiry in perspective: What if the defendants had sold Sunnyland to Soparind not two years after the Pidcock buyout, but rather ten years after the buyout? Surely, if this were the case, plaintiff could not allege that the material omission proximately caused him to suffer injury; the time span between the buyout and ultimate sale, absent unimaginable circumstances, would, acting of itself, be enough to break a causal nexus.[3] Of course, this case presents a two year, not ten year, time span. Yet the inquiry remains the same.

Essentially, in order to establish causation, the Court must presume the following scenario. First, that Mr. Pidcock, had he known of the brokerage arrangement, and of the Field interest, would not have executed the sale of his stock on December 21, 1982. The Court has already identified the hidden information as material, and can thus say that plaintiff would not have executed the redemption agreement on December 21, had he been made aware of the information held by defendants at that time. The next and crucial step in the causal chain involves the Soparind interest. Plaintiff testified that he would not have sold his stock, had he known that Soparind expressed an interest in the purchase of Sunnyland. The Court presumes, and fairly so, that plaintiff's decision to retain his stock could have been affected by a veritable interest only; a fleeting interest shown by Soparind, or any other party, would not have affected plaintiff's decision inasmuch as insubstantial interests had flickered

many times up to and through the date of plaintiff's sale; a third party interest without true color would not have affected plaintiff's decision in any manner different than before.

The Court has already determined, based on the testimony of Richard Egan, a credible witness and also the only individual with authority to speak in 1982–83 and at trial, of Soparind's capacity and desire to purchase Sunnyland, that Soparind was not interested in purchasing Sunnyland during the period between the execution of the redemption agreement through, at least, January 1984. Critical to the instant discussion is the extent of the Soparind interest during the time span between the signing and the closing of the redemption agreement (December 21, 1982—March 30, 1983). During this period, the only meeting Joe Harvard had with Richard Egan was at the AMI Boca Raton convention in February 1983. Plaintiff would have the Court believe that at this meeting, Richard Egan and Joe Harvard discussed the sale of Sunnyland, and that "Mr. Egan and/or all parties concerned agreed to postpone further sales discussions until a presentable length of time after the redemption of plaintiff's stock so as to avoid a more obvious appearance of impropriety." (First Amendment to Plaintiff's Proposed Findings of Fact and Conclusions of Law at 6). Based on this premise, plaintiff further suggests that a continuous scheme to defraud was perpetrated upon him by virtue of a two year effort in which active negotiating between the Harvards and Soparind was kept hidden or purposefully delayed. The Court cannot accept this scenario.

The plaintiff testified to a number of reasons why he decided to sell his interest. First, he doubted the competence of the

---

**3.** In a similar vein, the defendants have noted that "[h]ad the sale ... to SIPCO taken place as announced [in 1984], no one would seriously contend that plaintiff had suffered any loss or even had any standing to sue under the Rule. If, therefor [sic] there is no loss causation on the proposed sale to SIPCO, there can be no loss causation for a sale to Soparind...." Defendant's argument in reliance on a hypothetical purchase of Sunnyland by SIPCO factually confuses the causal inquiry. The Court believes that the purchaser of Sunnyland is irrelevant under the present circumstances. The question, in simplest form, is whether defendant's omissions prevented plaintiff from sharing in the sale of Sunnyland—irrespective of the identity of the purchasing party.

Harvards to manage Sunnyland successfully, and was pessimistic about the future of Sunnyland in general. Second, having experienced significant health problems, plaintiff was feeling extremely mortal and was concerned about protecting his estate, and particularly his wife's financial security; thus, in view of what he perceived to be a faltering business and, in particular, his concern with the buy/sell agreement that entailed a fifteen year deferred payment process for a purchase of his ownership after death, plaintiff questioned the soundness of retaining his Sunnyland interest. Third, there had been no fruitful efforts with reference to the sale of Sunnyland in the past, and at that time there was no real likelihood of a buyer in the future. Fourth, SIPCO, the only potential purchaser of substance, had just bottomed-out on its purchasing interest, giving rise to the belief that a buyer for Sunnyland was not to be found.

The same circumstances and rationale that prompted the plaintiff to sell his interest after the SIPCO fall-out, would have recurred after it became clear that Soparind was also not interested in purchasing Sunnyland, perhaps with even greater effect because of the repetition. It is therefore fair to assume that Pidcock would have sold his interest not long after the time he actually did so; once Richard Egan established Soparind's disinterest in purchasing Sunnyland. The situation would have been identical to that of weeks prior.[4] At least, the Court cannot say that plaintiff has proved the opposite is true.

The Court is asked to presume that the Harvards undertook a 1 million dollar renovation of Sunnyland facilities with a known but undisclosed pact between themselves and Soparind to the effect that Soparind *would* purchase Sunnyland at some point in the future. That SIPCO appeared in the

interim, and expressed what appears to have been a very real intent to purchase Sunnyland, is hard to square with this causal scenario. Is the Court to assume that SIPCO management was involved in the scheme to divert attention from the "obvious appearance of impropriety?"

The monkey wrench in the Court's analysis involves the role played in this drama by Joe Ryland. His consanguinity to Joe Harvard and to Richard Egan is not easily reconciled. The Court's view, with respect to Joe Ryland, is this: Ryland is and was a good friend of Joe Harvard. He would have liked to inspire or encourage a sale of Sunnyland to Soparind. He thought, as did all concerned, that Sunnyland and Field made for a good match and that the companies would have worked well under the single ownership of Soparind. Too, assisting a friend was not an inhibiting thought. However, Ryland could not speak on behalf of Soparind. He could merely attempt to bring together Harvard and Egan. This he did in Boca Raton, and tried continually to do thereafter; however, a sale could not be consummated without a desire on the part of Soparind—and that desire was absent at the time.

The Court's finding, that plaintiff has failed to prove loss causation is based in large part on the belief that Soparind was not a viable purchasing prospect before, at the earliest, January 1984. In that Soparind's ultimate decision to buy Sunnyland was not generated, at the earliest, until January 1984, Soparind may be viewed as a completely different purchaser, unrelated to the information withheld from Pidcock when he entered the redemption agreement. Soparind's subsequent purchase of Sunnyland may be viewed as an independent intervening element in the alleged causal chain.

It is axiomatic that fraudulent misrepresentations are not actionable where the

---

**4.** It could viably be argued that after the meeting between Joe Harvard and Richard Egan, it became clear to defendants that Soparind was not a substantive purchasing prospect; thus, the information, undisclosed by defendants prior to the execution agreement, was no longer materi-

al and thus could give no cause for reliance. *See Moody v. Bache & Co., Inc.,* 570 F.2d 523, 528 (5th Cir.1978); *see also, List v. Fashion Park, Inc.,* 340 F.2d 457 (2nd Cir.1965). However, the Court does not base its decision on this premise.

subsequent injury is due to an intervening or supervening cause. As applied to the sale of stock precipitated by misstatements, these principles of causation are satisfied only where the misrepresentation touches on the reasons for the investment's decline in value. Thus where one is induced to ... [sell] securities in reliance upon a claim which, however deceitful, is immaterial to the operative reason for the pecuniary loss, recovery under the theory of fraud is precluded by the inability to prove the requisite causation.

. . . . .

Causation in cases under the securities acts is governed by the principle ... that the loss complained of must proceed *directly* and proximately from the violation claimed and not be attributable to some supervening cause.

*Marbury Management, Inc. v. Kohn*, 629 F.2d 705, 718 (2nd Cir.1980) (Meskill, J., dissenting) (footnote and citation omitted) (emphasis in original); *accord, In Re Catanella*, 583 F.Supp. at 1415–17.

The issue of proximate cause is one uniquely fact sensitive. This case is no exception. However, "[a]s a practical matter, legal responsibility must be limited to those causes which are so closely connected with the result and of such significance

that the law is justified in imposing liability." *Prosser, Law of Torts* § 41 at 237 (4th ed.). Despite the intent on the part of the defendants to materially mislead, and plaintiff's reliance thereon, plaintiff has not demonstrated that a single, uninterrupted causal chain exists from the defendants' failure to inform plaintiff of the brokerage agreement and the Field interest, through the securities transaction to a demonstrable injury.[5]

The Court sympathizes with Mr. Pidcock; it was by virtue of his financial resources and personal generosity that Dude Harvard was able to obtain half ownership in Sunnyland; consequently, it was by virtue of plaintiff's resources and generosity that Joe and Bryant Harvard, at a tender age, began eating from a silver spoon. John Pidcock impressed the Court as being an individual schooled and seasoned on old world business ethics: his word is his contract and, when dealing with others, his cards are placed on the table. With utmost trust, Pidcock relied on business associates and apparent friends, and was deceived. He now feels betrayed, as well he should.

Nevertheless, in a 10(b)(5) action, the burden is on the plaintiff to prove each element by a preponderance of the evidence. To find liability here would be to overlook a fundamental element in the instant claim, and to "place righteousness

---

**5.** It should be noted that an interest for the purchase of Sunnyland was shown by Carr–Soe Enterprises, an investment group represented by Mr. Pitts Carr, sometime in late August 1983. This interest led to a letter of intent, dated January 30, 1984, for the purchase of Sunnyland for 8 million dollars at closing plus 2 million dollars deferred. Given Mr. Carr's interest, it is appropriate to address briefly whether such interest could be viewed as a missing link in the causal chain; that is, could it be said that Mr. Pidcock, if given the omitted information by defendants, would have held his stock after the Soparind interest proved insubstantial until the time that Carr–Soe Enterprises showed interest, and then, after Carr–Soe's interest did not result in a purchase, to the time of ultimate sale of Sunnyland. The Court is not satisfied that the Carr–Soe interest spans the gap between the initial non-disclosure and the alleged pecuniary loss. Mr. Carr testified that the letter of intent issued by Carr–Soe was not entirely genu-

ine. In fact, the "intent" of Pitts Carr is better described as "bait;" an attempt to inspire negotiations and to secure a significantly lower purchase price than that "offered." Thus, despite the letter of intent, Carr–Soe was no more of a substantial purchasing prospect than those that preceded it. More important is the fact that Pitts Carr did not substantively appear on the scene until August, 1983, some eight months after the original redemption agreement was entered, and some five months after the Pidcock closing occurred. That the Carr–Soe interest fills the link in the causation chain is too tenuous a reed upon which to find liability. The Court is satisfied that Mr. Pidcock, desiring to sell his interest and put his affairs in order, would have fulfilled his plan prior to the Carr–Soe interest, but subsequent to the realization that Soparind was not a viable purchaser. Alternatively, it cannot be said that plaintiff has proved the opposite.

over right." A 10(b)(5) claim must be made of sterner stuff. Proximate cause has not been established; accordingly, recovery under Rule 10(b)(5) is not permissible.

 Plaintiff's cause of action also includes a claim pursuant to Georgia law on fraud. The elements required to prove a cause of action for fraud under Georgia law are essentially the same as those required under Rule 10(b)(5). *See Bragg v. Sirockman,* 169 Ga.App. 643, 643, 314 S.E. 2d 478 (1984); *Eckerd's Columbia, Inc. v. Moore,* 155 Ga.App. 4, 5, 270 S.E.2d 249 (1980). Having failed to prove causation under 10(b)(5), it follows that plaintiff has failed to prove causation under his state law claim.

In view of the foregoing, judgment shall be entered on behalf of defendants and against plaintiff on all counts.